ROBERT S. YOUNG AND KIMBERLY C. YOUNG, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Young v. Commissioner
Docket Nos.: 15257-82; 1077-83; 9423-83; 21344-83; 35765-83; 10117-84; 24241-84; 31239-84; 31748-84; 35720-84; 39325-84; 431-85; 3139-85; 5422-85; 8309-85; 8355-85; 8693-85; 15867-85; 19726-85; 20272-85; 26324-85; 28022-85; 33572-85; 34422-85; 38121-85; 39657-85; 40466-85; 42407-85; 42539-85; 42540-85; 2869-86; 8120-86.
United States Tax Court
T.C. Memo 1988-440; 1988 Tax Ct. Memo LEXIS 479; 56 T.C.M. (CCH) 174; T.C.M. (RIA) 88440; September 15, 1988. Robert S. Lamont and Jan S. Neiman, for the petitioners in all docket Nos. Robert H. Infeld, for the petitioners in docket No. 31748-84. Allan F. Meyer, for the petitioners in docket No. 8309-85. Richard Baron, for the petitioners in docket No. 26324-85. Gary Walker and Kirk Chaberski, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax for the years and in the amounts for the various petitioners as follows: Petitioner
Year
Deficiency
Robert S. & Kimberly C. Young
1978
$    5,955.90
1979
73,977.00
1980
49,569.00
1981
13,911.00
1982
8,099.00
Frank N. & Barbara C. Fleishcer
1977
6,988.00
Osvaldo & Zoraida Diaz
1974
11,371.00
1975
7,381.00
1977
104,698.00
1978
83,005.00
1979
137,488.00
1980
41,072.02
1981
35,099.00
1982
50,250.00
Estate of Arthur J. Habersin
Deceased, Richard C. Carter
Personal Representative & Joan
Habersin
1980
18,270.00
1981
23,264.00
Jorge Egurrola
1978
17,919.00
1979
32,298.00
1980
16,962.55
1981
9,296.00
*482 Additions to tax, sections
Petitioner
6651(a),
6653(a),
6653(b)(1),
Robert S. & Kimberly C. Young
Frank N. & Barbara C. Fleisher
$ 407.00
$ 1,338.00
Osvaldo & Zoraida Diaz
$ 52,349.00
41,503.00
68,744.00
Estate of Arthur J. Habersin,
Deceased, Richard C. Carter,
Personal Representative & Joan
Habersin
914.00
1,163.00
Jorge Egurrola
2,031.00
8,075.00
4,421.39
2,324.00
Additions to tax, sections
Petitioner
6659,
6661.
Robert S. & Kimberly C. Young
Frank N. & Barbara C. Fleischer
Osvaldo & Zoraida Diaz
Estate of Arthur J. Habersin,
Deceased, Richard C. Carter,
Personal Representative & Joan
Habersin
Jorge Egurrola
Petitioner
Year
Deficiency
Ann Wilson
1979
$ 14,394.00
1980
18,726.00
1981
19,733.00
1982
12,904.00
Thomas O. & Betty F. Gentsch
1978
73,883.00
1979
111,489.56
1980
81,172.57
1981
185,465.06
Joel & Ellen S. Benson
1981
24,397.00
1982
37.643.00
John L. Wilson
1979
8,506.00
1982
22,851.00
Charles A. Lipman
1979
20,927.00
1980
36,064.00
Joe J. & Elaine P. Miles
1977
20,949.00
1978
139.724.00
1979
123,931.21
1980
126,977.60
1981
100,455.25
Marvin & Harriet Ribotsky
1980
20,243.00
1981
33,580.10
1982
16,027.51
*483 Additions to tax, sections
Petitioner
6651(a),
6653(a),
6653(b)(1),
Ann Wilson
Thomas O. & Betty F. Gentsch
$ 6,475.28
$ 7,475.28
4,058.63
9,273.25
Joel & Ellen S. Benson
876.00
3,439.00
John L. Wilson
1,480.75
Charles A. Lipman
Joe J. & Elaine P. Miles
Marvin & Harriet Ribotsky
Additions to tax, sections
Petitioner
6659, 6661.
Ann Wilson
$ 1,108.70
Thomas O. & Betty F. Gentsch
$ 16,606.66
Joel & Ellen S. Benson
John L. Wilson
Charles A. Lipman
Joe J. & Elaine P. Miles
Marvin & Harriet Ribotsky
Petitioner
Year
Deficiency
Edward & Katherine Rosengarten
1981
$ 24,888.40
1982
43,963.54
Edward Rosengarten
1983
28,014.00
Osvaldo Diaz, M.D., P.A.
FY 10/31/76
1,926.00
FY 10/31/77
19,065.00
FY 10/31/78
44,864.00
FY 10/31/79
5,054.00
FY 10/31/80
7,343.00
FY 10/31/81
16,999.00
Chang You WU & Elizabeth WU
1977
17,754.00
1978
22,318.00
Larry & Bonnie Shore
1978
22,412.03
1979
62,752.81
1980
103,268.66
1981
86,144.98
1982
77,407.00
Steven Gold
1981
11,968.00
1982
8,977.00
Paul T. & Elaine Richman
1980
10,566.00
1981
15,642.00
Harold & Helen Gold
1980
27,463.42
1981
57,229.62
1982
30,260.50
*484 Additions to tax, sections
Petitioner
6651(a),
6653(a),
6653(b)(1),
Edward & Katherine Rosengarten
Edward Rosengarten
Osvaldo Diaz, M.D., P.A.
$ 11,216.00
3,772.00
1,836.00
Chang You WU & Elizabeth Wu
Larry & Bonnie Shore
$ 1,120.60
3,137.64
5,163.43
4,307.25
3,870.35
Steven Gold
Paul T. & Elaine Richman
Harold & Helen Gold
Additions to tax, sections
Petitioner
6659,
6661.
Edward & Katherine
Rosengarten
$ 4,396.35
Edward Rosengarten
$ 8,338.20
Osvaldo Diaz, M.D., P.A.
1,081.00
Chang You Wu &
Elizabeth Wu
Larry & Bonnie Shore
Steven Gold
894.20
Paul T. &
Elaine Richman
Harold & Helen Gold
3,026.05
Petitioner
Year
Deficiency
Merle W. & Jean C. Merchant
1981
$ 56,633.01
1982
75,695.00
Filco, Ltd.
FY 2/28/81
77,263.00
FY 2/28/82
117,165.00
FY 2/28/83
82,734.00
Liveco, Inc.
FY 2/28/82
50,778.00
Sikeston Motel Corporation
FY 9/30/81
97,457.00
FY 9/30/82
114,707.00
FY 9/30/83
49,135.00
David C. Milgrom
1980
517.00
1981
8,053.00
1982
13,545.00
1983
2,163.00
*485 Additions to tax, sections
Petitioner
6651(a),
6653(a),
6653(b)(1),
Merle W. & Jean C. Merchant
FIlco, Ltd.
Liveco, Inc.
Sikeston Motel Corporation
David C. Milgrom
Additions to tax, sections
Petitioner
6659,
6661.
Merle W. & Jean C. Merchant
$ 7,569.50
Filco, Ltd.
Liveco, Inc.
Sikeston Motel Corporation
David C. Milgrom
$ 2,416.00
4,064.00
649.00
By Amended Answer respondent claimed an addition to tax under section 6621(c), [2] for each of the petitioners. Some of the issues raised by the pleadings in each case have been disposed of by agreement of the parties leaving for our decision the following: (1) Whether petitioners are entitled to any deductions for claimed losses in connection with a sale/leaseback of computer equipment in each of the years here in issue and, if so, to what extent are the deductions limited by the amounts for which petitioners were "at risk" within the meaning of section 465 with respect to the purchase price of the equipment, (2) whether each petitioner is liable for the addition to tax under section 6621(c), and (3) whether petitioners against whom *486 respondent determined an addition to tax under section 6661(a) are liable for that addition to tax. The specific arguments made by respondent in support of his disallowances of the losses claimed by petitioners in connection with the sale/leaseback transactions involving computer equipment differ to some extent for the different petitioners. In some of the transactions respondent questions whether the transactions totally lacked economic substance and were entered into solely for tax avoidance purposes. In other transactions, respondent argues that the transaction was not entered into with an intent to make a profit. In three of the transactions, respondent argues that petitioners have failed to establish that they had any depreciable interest in the equipment purchased. Respondent argues that petitioners in all but four of the transactions were protected against *487 loss on all amounts due under their long-term notes through guarantees, stop loss agreements, or other similar arrangements within the meaning of section 465(b)(4). In all of the transactions, respondent argues that the third-party lessor was in reality the obligee of the long-term note, since the person to whom the note was drawn was merely an intermediary or straw man, and that the third-party lessor had an interest in the property guaranteeing the note other than as a creditor within the meaning of section 465(b)(3). FINDINGS OF FACT Some of the facts in these consolidated cases have been stipulated and are found accordingly. Each of the individual petitioners in these cases, other than Larry and Bonnie Shore and David C. Milgrom, resided in Florida at the time their petitions in these cases were filed. Each of the individual petitioners, other than the Shores and David Milgrom, filed a joint or individual income tax return with the Internal Revenue Service Center in Atlanta, Georgia. Petitioners Larry and Bonnie Shore, husband and wife, resided in Houston, Texas at the time their petition in this case was filed. They filed their Federal income tax return for each of *488 the years here in issue with the Internal Revenue Service Center in Austin, Texas. Petitioner David L. Milgrom resided in Chicago, Illinois at the time his petition in this case was filed. He filed his individual Federal income tax return for each of the taxable years involved in his petition with the Internal Revenue Service Center in Kansas City, Missouri. All the corporate petitioners, except Sikeston Motel Corporation, had their principal place of business in Florida at the time they filed their petitions in this case. Each of these corporate petitioners filed a corporate Federal income tax return for the years involved in this case with the Internal Revenue Service Center in Atlanta, Georgia. Sikeston Motel Corporation had its principal place of business in Sikeston, Missouri at the time it filed its petition in this case. The corporation filed its United States corporate Federal income tax return for its fiscal years involved in this case with the Internal Revenue Service Center in Atlanta, Georgia. Each of the petitioners in these cases, except Charles A. Lipman and Chang You Wu and Elizabeth Wu, entered into transactions involving the purchase and leaseback of *489 computer equipment pursuant to offerings made to them by a representative of Equipment Leasing and Management Company (Elmco, Inc. or Elmco) or Computer Trading Corporation (CTC), a wholly owned subsidiary of Elmco, Inc. Mr. E. Lee Meadows is, and was at all times here relevant, the chief operating officer and sole shareholder of Elmco, Inc., which he had incorporated in the spring of 1977. Mr. Lipman and Chang You Wu and Elizabeth Wu entered into their transactions directly with Computer Capital Corporation (CCC) which operated a computer leasing business. Mr. Meadows was a vice-president of CLC during 1977 when these transactions were entered into. CLC was in the business of purchasing computer equipment and leasing that equipment to users of computer equipment. Companies which purchased computer equipment, leased it to end-users and then sold the equipment to other persons from whom they leased back the equipment, are referred to herein as third-party lessors. The sublessees of the equipment who used it in their business operations will be referred to as the users or user-lessees. The transactions entered into by petitioners in these cases would be in the form of an agreement *490 by petitioner to purchase computer equipment from Elmco or CTC and lease it to the third-party lessor from whom Elmco had purchased the equipment. Elmco would locate equipment which was in the hands of a third-party lessor and arrange to purchase that equipment from the third-party lessor. As soon as the agreement was entered into, Elmco would find investors such as petitioners in these cases to purchase the equipment from Elmco. Elmco's purchase of the equipment from the third-party lessors was consummated simultaneously with the consummation of the sale by Elmco to the investors. In many instances, several individuals would participate in the purchase of one package of computer equipment, each having a percentage interest in the package. Generally, third-party lessors purchased computer equipment from the manufacturer, such as IBM, and leased that equipment to user-lessees. The third-party lessor made some down payment on the equipment and borrowed the remaining amount necessary to purchase the equipment from a bank on a note payable over a period of time. Generally, the time for payment of this note was no longer than the length of time of the lease that the third-party lessor *491 had negotiated with the user-lessee. When the third-party lessor sold the equipment to either Elmco or an investor, the third-party lessor would receive a down payment generally in excess of its down payment to the bank, and in the case of Elmco or CTC, would take a nonrecourse note for the balance of the purchase price. Elmco, in turn, would sell the equipment if had bought from the third-party lessor to one or more investors at a price higher than it had paid the third-party lessor. It would require a down payment of more than the amount of the down payment it had paid to the third-party lessor and in this manner Elmco or CTC made its profit. An installment note taken by Elmco or CTC for the balance of the payment would be in the exact amount with the exact payment schedule of Elmco's or CTC's note to the third-party lessor. When Elmco would enter the agreement to purchase the equipment from the third-party lessor it would lease the equipment back to the third-party lessor at an amount sufficient to make the payments on its nonrecourse note to the lessor and for a period of time sufficient to pay off that nonrecourse note. Sometimes the lease payments would be somewhat in *492 excess of the amount of the note payments. Since the equipment would generally be pledged to the bank from which the third-party lessor had borrowed the money to purchase the equipment, the sale would be subject to that lien. Elmco would pledge the equipment, subject to the bank lien, to the third-party lessor to secure its note. The third-party lessor would guarantee, to Elmco or CTC when they purchased the equipment, the rental payments provided for in the lease. When Elmco sold the equipment it had purchased to investors, including the petitioners in these cases, the investor's down payment, in some instances, included in addition to cash, equity recourse notes. These equity notes were short term, generally a year or less, and were generally guaranteed by an irrevocable letter of credit. The investor's installment note payable over the same length of time and in the same amount as the payments due from Elmco or CTC to the third-party lessor was referred to as a "partial recourse" note. As part of the transaction, Elmco would assign its rights to the payments under the leases and all its other rights in its purchase transaction to the investors. Any excess of the lease payments *493 over the amounts due on the investors' installment notes would go to the investors. The following schedule shows the name of each petitioner, the percentage interest in the package of equipment held by that petitioner, the company through which the equipment was purchased, the name of the third-party lessor, the transaction date, the purchase price, the cash down payment, the amount of the equity notes, the amount of the installment notes, whether or not there was a deferral clause deferring payment in case of a default of rent, and if so, the date to which deferred, the term of the installment notes, and the installment note payments per month in each of the transactions here involved. Also noted under the amount of the installment note is the amount stated to be with recourse and the amount stated to be without recourse. Percentage
Third
Interest
Purchased
Party
Transaction
Name
In Package
Through
Lessor
Date
Young
100   Elmco
CIG
Computers,
11/01/78
Gmbh
Fleischer
5   Elmco
National
Equipment
12/29/77
Rental,Ltd.
Diaz #1
5   Elmco
National
Equipment
06/30/78
Rental, Ltd.
Diaz #2
100   Elmco
Comdisco,
Inc.
06/30/82
Habersin #1
31.51
Elmco
I.P.S.
Computer
06/30/80
Marketing
Corp.
Habersin #2
22.22
Elmco
Unicom
Computer
06/30/80
Company
*494 Equity
Equity
Purchase
Cash
Note Note Name
Price Downpayment
No. 1
No. 2
Young
$   513,000
$ 81,500
N/A N/A Fleischer
$ 205,000
1,240,000
62,000
due
N/A 1/15/78
at 10%
Diaz #1
1,330,000
266,000
N/A N/A Diaz #2
23,000
24,000
335,00
25,000
due
due
1/15/83
1/15/84
at 18%
at 18%
Habersin #1
25,250
17,750
365,000
36,000
due
due
1/15/81
1/15/82
at 15%
at 15%
Habersin #2
17,000
17,000
245,000
18,000
due
due
1/15/81
1/15/82
at 15%
at 15%
Amount of
Installment
Deferral
Name
Note
Clause
Young
$ 431,500
total
12/31/91
203,048
w/recourse
228,452
w/out
Fleischer
973,000
Total
N/A
629,810
w/recourse
343,190
w/out
Diaz #1
1,064,000
total
N/A
644,042
w/recourse
419,958
w/out
Diaz #2
263,000
total
$
B
12/31/99
231/474
w/recourse
31,526
w/out
Habersin #1
286,000
total
12/31/92
180,353
w/recourse
105,647
w/out
Habersin #2
193,000
total
12/31/92
132,004
w/recourse
60,996
w/out
*495 Term of
Installment
Installment
Note Payments
Name
Note
per Month
Young
$ 3,595.83
for 1st 2
110 mos.
4,454.45
for next 24
6,786.44
for last 84
Fleischer
7,094.79
for 1st 24
108 mos.
16,392.77
for next 60
12,590.60
for last 24
Diaz #1
13,205.83
for 1st 31
108 mos.
14,895.00
for last 77
Diaz #2
3,407.18
for 1st 30
108 mos.
5,377.57
for last 78
Habersin #1
3,575.00
for 1st 30
108 mos.
5,761.29
for last 78
Habersin #2
2,412.50
for 1st 30
108 mos.
3,887.86
for last 78
Percentage
Third
Interest
Purchased
Party
Transaction
Name
In Package
Through
Lessor
Date
Egurrola #1
13.5
Elmco
CIG-FM
Leasing 12/7/78
Corp.
Egurrola #2
5  Elmco
CIG
Computers, 12/27/78
Gmbh
Wilson #1
10  Elmco
CIG
Computers, 6/29/79
Gmbh
Wilson #2
10  Elmco
Unicom 6/30/80
Gentsch
50  Elmco
S.P.
Computer 12/29/78
Capital,
Inc.
Benson
100  CTC
Tiger
Computer 12/01/81
Equity
Equity
Purchase
Cash
Note
Note
Name
Price
Downpayment
No. 1
No. 2
Egurrola #1
$ 1,150,000
$ 237,000
N/A
N/A
Egurrola #2
1,500,000
255,000
N/A
N/A
Wilson #1
1,600,000
80,000
82,000
88,000
due
due
1/15/80
1/15/81
at 10%
at 10%
Wilson #2
850,000
62,000
55,500
41,500
due
due
1/15/81
1/15/82
at 15%
at 15%
Gentsch
1,975,000
395,000
N/A
N/A
Benson
395,000
15,500
29,500
30,000
due
due
6/30/82
2/28/83
at 16%
at 16%
*496 Amount of
Installment
Deferral
Name
Note
Clause
Egurrola #1
$ 913,000
total
12/31/91
549,993
w/recourse
363,007
w/out
Egurrola #2
1,245,000
total
12/31/91
653,952
w/recourse
591,048
w/out
Wilson #1
1,350,000
total
12/31/91
775,108
w/recourse
574,892
w/out
Wilson #2
691,000
total
12/31/92
473,930
w/recourse
217,070
w/out
Gentsch
1,580,000
total
12/31/91
1,013,498
w/recourse
566,502
w/out
Benson
320,000
total
N/A
175,182
w/recourse
148,818
w/out
Term of
Installment
Installment
Note Payments
Name
Note
per Month
Egurrola #1
$ 6,847.50
for 1st 2
108 mos.
9,188.19
for next 24
13,943.51
for last 82
Egurrola #2
12,851.11
for 1st 24
108 mos.
19,581.34
for last 84
Wilson #1
11,250
for 1st 3
123 mos.
5,850
for next 6
7,000
for next 24
23,800.81
for last 90
Wilson #2
8,637.50
for 1st 30
108 mos.
13,919.75
for last 78
Gentsch
15,272.75
for 1st 24
108 mos.
25,305.19
for last 84
Benson
1,660
for 1st 25
84 mos.
10,186.10
for last 59
*497 Percentage
Third
Interest
Puchased
Party
Transaction
Name
In Package
Through
Lessor
Date
Lipman
30    CCC
Funding
Systems 12/29/77
Leasing,
Corp.
Miles
15    CCC/
CCC
Elmco 12/15/77
Ribotsky
33-1/3
Elmco
Comdisco 12/30/80
Rosengarten
100    CTC
Tiger
Computer 12/01/81
Diaz, MD PA
10    Elmco
National
Equipment 06/30/78
Rental, Ltd.
Wu
30    CCC
Funding
Systems 12/29/77
Leasing,
Corp.
Equity
Equity
Purchase
Cash
Note
Note
Name
Price
Downpayment
No. 1
No. 2
Lipman
$   540,000
$ 82,700
N/A
N/A
Miles
1,765,000
88,000
150,000
97,000
due
due
1/15/78
1/15/79
at 10%
at 10%
Ribotsky
1,000,000
10,000
20,000
20,000
due
due
2/15/81
1/15/82
at 18%
at 18%
Rosengarten
395,000
15,500
29,500
30,000
due
due
6/30/82
2/28/83
at 16%
at 16%
Diaz, MD PA
1,330,000
266,000
N/A
N/A
Wu
540,000
82,700
N/A
N/A
Amount of
Installment
Deferral
Name
Note
Clause
Lipman
$ 457,300
total
Undated
271,638
w/recourse
185,662
w/out
Miles
858,247
recourse
to Elmco
N/A
571,753
nonrecourse to CCC
Ribotsky
950,000
total
12/31/92
668,492
w/recourse
281,508
w/out
Rosengarten
320,000
total
N/A
175,182
w/recourse
148,818
w/out
Diaz, MD PA
1,064,000
total
N/A
644,042
w/recourse
419,958
w/out
Wu
457,300
total
Undated
271,638
w/recourse
185,662
w/out
*498 Term of
Installment
Installment
Note Payments
Name
Note
per Month
Lipman
$ 3,334.48
for 1st 24
108 mos.
7,394.03
for next 60
6,977.36
for last 24
Miles
Elmco note
63 mos.
4,861.22
for 1st 30
28,587.14
for last 33
Ribotsky
108 mos.
9,754.05
for 1st 24
16,933.57
for next 84
Rosengarten
1,660
for 1st 25
84 mos.
10,186.10
for last 59
Diaz, MD PA
13,205.83
for 1st 31
108 mos.
14,895.00
for last 77
Wu
3,334.48
for 1st 24
108 mos.
7,394.03
for next 60
6,977.36
for last 24
Percentage
Third
Interest
Purchased
Party
Transaction
Name
In Package
Through
Lessor
Date
Shore
100  Elmco
Comdisco 12/31/80
Steven Gold
22.5
Elmco
Comdisco 12/31/80
Richman
100  Elmco
Comdisco 12/31/80
Harold &
77.5
Elmco
Comdisco 12/31/80
Helen Gold
Merchant
100  Elmco
Comdisco 12/3/81
Filco
52  Elmco
Comdisco 2/27/81
Equity
Equity
Purchase
Cash
Note
Note
Name
Price
Downpayment
No. 1
No. 2
Shore
$ 686,000
$ 22,000
$ 50,000
$ 55,800
due
due
4/1/81
1/10/82
at 18%
at 18%
Steven Gold
445,000
13,000
32,500
38,200
due
due
2/1/81
1/10/82
at 18%
at 18%
Richman
145,000
5,250
12,250
12,500
due
due
2/1/81
1/10/82
at 18%
at 18%
Harold &
445,000
13,000
32,500
38,200
Helen Gold
due
due
2/1/81
1/10/82
at 18%
at 18%
Merchant
675,000
24,000
48,000
67,000
due
due
5/31/82
2/1/83
at 18%
at 18%
Filco
1,400,000
50,000
118,000
94,000
due
due
8/31/81
3/31/82
at 18%
at 18%
*499 Amount of
Installment
Deferral
Name
Note
Clause
Shore
$ 558,200
total
12/31/92
389,489
w/recourse
168,711
w/out
Steven Gold
361,300
total
12/31/92
259,540
w/recourse
101,760
w/out
Richman
115,000
total
12/31/92
79,736
w/recourse
35,264
w/out
Harold &
361,300
total
12/31/92
259,540
w/recourse
101,760
w/out
Merchant
536,000
total
12/31/9
432,220
w/recourse
103,780
w/out
Filco
1,138,000
total
12/31/92
775,202
w/recourse
362,798
w/out
Term of
Installment
Installment
Note Payments
Name
Note
per Month
Shore
$ 6,673,83
for 1st 24
108 mos.
10,568.02
for last 84
Steven Gold
5,413.91
for 1st 24
108 mos.
7,589.82
for last 84
Richman
1,349.95
for 1st 24
108 mos.
2,160.59
for last 84
Harold &
5,413.91
for 1st 24
108 mos.
7,589.82
for last 84
Merchant
6,028.29
1st part.payment
108 mos.
6,791.17
for 1st 24
10,404.54
for last 84
Filco
12,212.81
for 1st 24
108 mos.
20,627.16
for last 84
Percentage
Third
Interest
Purchased
Party
Transaction
Name
In Package
Through
Lessor
Date
Liveco
48
Elmco
Comdisco 2/27/81
Sikeston
100
Elmco
Comdisco 10/30/80
Milgrom
50
Elmco
Comdisco 11/26/82
*500 Equity
Equity
Purchase
Cash
Note
Note
Name
Price
Downpayment
No. 1
No. 2
Liveco
$ 1,400,00
$ 50,000
$ 118,000
$ 94,000
due
due
8/31/81
3/31/82
at 18%
at 18%
Sikeston
1,325,000
49,000
112,000
114,000
due
due
2/1/81
1/10/82
at 14%
at 14%
Milgrom
381,000
14,715.50
26,000
40,000
due
due
7.15.83
5/15/84
at 16%
at 16%
Amount of
Installment
Deferral
Name
Note
Clause
Liveco
$ 1,138.000
total
12/31/92
775,202
w/recourse
362,798
w/out
(as amended)
Sikeston
1,050,000
total
12/31/92
716,389
w/recourse
333,611
w/out
Milgrom
301,000
total
12/31/99
266,976
w/recourse
34,024
w/out
Term
Installment
Installment
Note Payments
Note
per Month
Liveco
$ 12,212.81
for 1st 24
108 mos.
20,627.16
for last 84
Sikeston
11,488.66
for 1st 24
108 mos.
19,175.79
for last 84
Milgrom
3,120.34
for 1st 25
108 mos.
5,425.35
for last 83
Mr. E. Lee Meadows (Mr. Meadows), who managed the operations *501 of Elmco and CTC, has a bachelor's degree in engineering from Syracuse University and a master's degree in engineering from the University of West Virginia. After graduating from college Mr. Meadows went to work for Union Carbide Corporation as an engineer. In the early 1950's he was assigned by Union Carbide to work with computers and ultimately moved from the engineering department of Union Carbide into management of the computer departments. Thereafter he was put in charge of the home office computer group of Union Carbide. In March of 1967, Mr. Meadows resigned from Union Carbide and joined a small company, Computer Leasing Company (CLC). CLC was formed in the late 1960s to enter the third-party computer leasing business. While employed by CLC, Mr. Meadows was responsible for purchasing equipment and leasing it out to end-users for CLC. Mr. Meadows also was involved with the remarketing of the equipment owned and leased by CLC when it came off at the end-user leases. In 1975 CLC was sold to Greyhound Corporation and Mr. Meadows worked for Greyhound Corporation for a short period of time and after he voluntarily terminated his employment with Greyhound Corporation he became *502 a consultant to that corporation. In the spring of 1976, Mr. Meadows formed Elmco as a sole proprietorship and incorporated it in the spring of 1977. Mr. Meadows, on behalf of Elmco, began approaching various third-party leasing companies, soon after the formation of Elmco, with the suggestion that they enter into sale/leaseback transactions with respect to their computer equipment to increase their available assets to buy computer equipment. When Mr. Meadows called on a leasing company he would discuss with its representatives how to put a transaction together which would provide equity to the leasing company by selling equipment to individual investors. Mr. Meadows would generally deal in IBM equipment because of the requirement that IBM service the equipment sold to third-party lessors. This requirement caused the IBM equipment generally to have a better used market than some other equipment. When Mr. Meadows had, on behalf of Elmco or CTC, an agreement for the purchase from a third-party lessor of computer equipment that he considered to be good equipment to offer to investors, Mr. Meadows would prepare an offering memorandum which reflected the terms of the transaction being *503 offered to the investor. The offering memorandum outlined in general the amount of cash down payment or short-term equity notes, the amount of the installment notes, and the amount of the installment notes to be recourse or nonrecourse. Generally the offering memorandum would contain projections of rent sharing, if rent sharing was to be a part of the agreement, and a projection of residual value of equipment when the master lease terminated, estimated at the time the offering memorandum was prepared. Although with some large investors certain items as set forth in the offering memorandum might be changed, generally the transaction as outlined in the offering memorandum was not negotiable by the investor and he could either accept it as set forth or decline to participate in the investment. In addition to the projections which Mr. Meadows placed in the offering memorandum, he would usually discuss the equipment that was being offered to the investors with a Mr. Tom Norris (Mr. Norris) who had been an acquaintance of his for some time and, in many instances, the offering memorandum would state that an appraisal would be made by Mr. Norris. In many instances, Mr. Norris prepared *504 a written summary appraisal of the equipment for the transactions which Elmco or CTC offered. These appraisals would reflect Mr. Norris's opinion of the fair market value of the equipment as of the date of the transaction, the expected rental receipts from the equipment during any period in which the master lease called for rent sharing, the expected residual value of the equipment at the end of the master lease, and the expected useful life of the equipment. The following schedule shows, with respect to the transactions here in issue, the date of Mr. Norris's appraisal of the equipment, and the projected rent-sharing income and equipment residual value, less the applicable remarketing fee, as shown in Mr. Norris's appraisal. Date
Rent
Transaction
of Report
Sharing
Equipment
Total
Young
11/10/78
$ 45,427.20
$ 92,340.00
$ 137,767.20
Fleischer
01/06/78
91,248.00
189,045.00
280.293.00
Diaz No. 1
03/23/78
169,680.00
478,800.00
648,480.00
Diaz No. 2
07/01/82
73,644.00
60,300.00
133,944.00
Habersin No.1
06/17/80
225,432.00
73,000.00
298,432.00
Habersin No.2
06/20/81
38,535.12
49,000.00
87,535.12
Egurrola No.1
10/13/78
80,400.00
207,000.00
287,400.00
Egurrola No.2
11/10/78
131,664.00
270,000.00
401,664.00
Wilson No.1
03/19/79
211/915/44
288,000.00
499,915.44
Wilson No.2
06/20/80
140,640.00
170,000.00
310,640.00
Gentsch
12/27/78
Insufficient
355,500.00
--
Evidence [1]
Benson
12/09/82 &
-0-
81,765.00
81,765.00
12/18/81
Lipman & Wu
01/13/78
-0-
97,200.00
97,200.00
Miles
10/27/77
--
319,884.00
319,884.00
Ribotsky
11/18/80
130,440.00
180,000.00
310,440.00
Rosengarten
12/09/81
63,174.31
81,765.00
144,939.31
Shore
11/18/80
82,704.00
123,480.00
206,184.00
Gold
11/18/80
57,600.00
80,100.00
137,700.00
Richman
11/18/80
17,496.00
26,100.00
43,596.00
Merchant
12/01/81
156,949.20
121,500.00
278,449.20
Filco & Liveco
02/16/81
123,192.00
252,000.00
375,192.00
Sikeston
11/18/80
Insufficient
238,500.00
--
Evidence [2]
Milgrom
11/10/82
106,044.00
68,580.00
174,624.00
*505 In every case in which Mr. Norris made an appraisal and an offering memorandum was prepared, Mr. Meadows provided Mr. Norris with the sales price by Elmco to the investors and the lease receipts prior to the preparation of Mr. Norris's appraisal. Each of the petitioners in these cases reviewed the offering memorandum and, where available, Mr. Norris' appraisal of the computer equipment, before entering into the sale/leaseback transaction. Although there were some differences in the various documents furnished to and signed by the various petitioners, they were substantially the same in substance. Also, in all instances (except approximately *506 20 percent in value of the equipment sold to the Youngs), the equipment was IBM equipment which was being maintained by IBM. In the case of the Youngs, 80 percent in value was IBM computers. As an example of the offering memorandum, the following is quoted from that memorandum prepared in late 1977 in the Fleischer case: III. DESCRIPTION OF THE TRANSACTION Equipment Leasing & Management Company (ELMCO) will sell one IBM System 370/148 computer and one IBM System 370/125 computer to individual or corporate investors. ELMCO will, prior to the time of the sale, enter into a "net lease" of the equipment with National Equipment Rental, Ltd., (NER) a Delaware corporation from which ELMCO is purchasing the computer system. This lease will be assigned to Buyer. The Buyer will received a Bill of Sale for the equipment showing the specific items purchased with identifying serial numbers and the present location of the equipment. The equipment is on lease to end user lessees and is being maintained by the manufacturer. The equipment will be sold free and clear of all other debt except an existing first mortgage, a lien in favor of NER, and the existing leases. Payments under the existing *507 lease are sufficient to meet all dept payments related to this equipment. ELMCO has arranged for all financing necessary except for the equity cash requirement. Sale Price
ELMCO will sell the computers to an individual or corporate buyer for $ 1,240,000. This is approximately 102% of the manufacturer's current list price of $ 1,206,837. ELMCO has added to the purchase cost all expenses associated with the transaction including costs of obtaining the lease, arranging for financing, and obtaining a buyer, legal and accounting fees, plus a sufficient markup to cover internal costs and its own fee. Underlying Debt
The equipment on lease to General Foods Corporation is free of all debt except the purchase indebtedness owed by ELMCO to NER for the purchase of the equipment leased to both General Foods Corporation and Goulds Pumps, Inc. That purchase money indebtedness is in the same amount and on the same terms as described below regarding the buyer's limited recourse indebtedness. There is an underlying indebtedness owned to Lincoln First Bank Central, Syracuse, New York (the "Bank"). The loan was for an original sum of $ 792,324 at 9 1/2% per annum. It is to be paid *508 in seventy-two monthly installments of $ 17,458 each and will be fully paid on September 1, 1983. The rent from the lease with Goulds Plumps, Inc. has been assigned to the Bank as security for the payment of that loan, and, as such, the Bank has a first lien on both the equipment leased to and the rent due from Goulds Pumps, Inc.
Financing
The total equity required to purchase the equipment for $ 1,240,000 from ELMCO is $ 267,000 which will be used as downpayment. So that the buyer can provide equity from tax savings, the buyer may choose to delay paying some of the equity until 1978 and 1979. The buyer may arrange for recourse loans from a bank of his own choice or ELMCO will accept two personal promissory notes from the buyer for $ 205,000 total, in which case $ 62,000 of cash would be required at closing. Both these notes would be fully recourse to the buyer and must be secured by letters of credit from a bank acceptable to ELMCO. Both notes will bear interest at the rate of 10% per annum. One note in the amount of $ 105,000 will be payable, principal plus accrued interest, on January 15, 1978. The second note in the amount of $ 100,000 will be payable, principal *509 plus interest on January 15, 1979. The balance of the purchase price, $ 973,000 will be represented by an installment note from the Buyer, payable in arrears and bearing interest of approximately 8.75% per annum. The note in the amount of $ 973,000 will provide recourse to ELMCO, against the Buyer in the event of default for $ 629,810 of principal thereof. The note (hereinafter called the "Limited Recourse Note") will be paid out of rental income. Payments on the Limited Recourse Note to ELMCO will be $ 3,547.40 interest only, through December 31, 1977 and, thereafter commencing on January 31, 1978 and for 108 consecutive months on the last day of each month as follows: twenty-four monthly payments of $ 7,094.79 each; the next 60 payments of $ 16,342.77 each; the last 24 payments of $ 12,590.60 each. ELMCO will retain a security interest in the equipment and proceeds therefrom securing the Limited Recourse Note subordinate to the lien of the Lincoln First Bank Central, Syracuse, New York. All notes and mortgages may be assigned by ELMCO. Lease Between Seller and NER
ELMCO will lease the equipment to NER for nine years (108 months) beginning January 1, 1978 plus the short *510 additional term from the date of purchase by the Buyer, on or about December 15, 1977 through December 31, 1977. This lease will be assigned by ELMCO to the Buyer. All rents will be payable to arrears. The lease will be a "net lease" as defined by the IRS, with Lessee being responsible for all costs of ownership and use, including maintenance, insurance, and property taxes. Rents through December 31, 1979 will be $ 7,094.79 per month and will be prorated for any partial month in 1977 based on a thirty day month. Rent for the next sixty months, beginning January 31, 1980, will be $ 16,755.35 per month. During the last twenty-four months of the lease, NER will pay a minimum rent of $ 13,223.18 per month, and in the event rent received from sub-lessee is greater than that amount, 50% of the excess will be paid to the Buyer as additional rent. Rents for the last twenty-four months are projected to be a total of $ 16,755.35 per month. IT IS NOT CERTAIN THAT RENTS FROM THE LAST FIFTEEN MONTHS WILL EQUAL 50% OF THE RENTS BEING RECEIVED FROM THE INITIAL END USER LESSEE SO THAT THE CASH RECEIVED BY THE BUYER MAY BE LIMITED TO THE RENT GUARANTEED BY ELMCO. Guaranteed Cash Flow
*511 During the last eighty-four months of the lease with NER the Buyer will receive a guaranteed cash flow of $ 362.58 per month for a total of $ 30,456.72. This cash flow will be paid by NER as a rental payment regardless of the amount of rents received by it from sublessees and guarantees the Buyer will receive at least 10% of the equity investment as cash flow. The Buyer will receive additional cash flow during this period to the extent rent received from sublessees exceeds the minimum rental over the last twenty-four months of the lease with NER. Disposition of Equipment at End of Lease
The Buyer will receive as assignment of a Remarketing Agreement with NER to sell the equipment at the end of the lease term. The net proceeds from the sale will be divided between the Buyer and NER to the extent possible on the following basis: 1. The Buyer will receive first $ 210,050 from the sale. (This is equal to 16.8% of the purchase price for the equipment.) 2. NER will receive the next $ 105,025. 3. Amounts received above $ 315,075 will be divided equally between the Buyer and NER. The net proceeds are the gross amount received from the sale less all costs incurred making *512 the sale including costs of delivering and installing the equipment. The offering memorandum contained a statement that Elmco would provide each buyer with an appraisal by an equipment appraiser of the current fair market value of the equipment, the estimated residual value, the estimated useful life, and the estimated potential rental income after termination of the primary lease. It stated that Elmco made no representations concerning current value or future value of the equipment. The offering memorandum also contained a statement showing the sources of Elmco's funds and the amount of Elmco's profits. The offering memorandum in section IV, under the heading Tax Considerations, contained six pages discussing the tax effect of the transaction. Under paragraph A. Tax Reform Act of 1976, the offering memorandum stated: The Tax Reform Act of 1976, which was signed into law on October 4, 1976, contains significant changes in the tax rules relating to equipment leasing. Changes in the rules on deductibility of investment interest and prepaid interest and points reduce such deductions in early years of certain equipment leasing transactions. New rules have been added to restrict *513 the use of non-recourse debt. * * *
These general statements are explained in more detail further in the discussion. Attached to the offering memoranda was a description of the equipment, the equity required and the equity required per unit, the debt and debt service, an estimate of residual value, and the approximate deduction for income tax purposes available with respect to the transaction in each of the first three years. (In the Fleischer case, 1977, 1978 and 1979.) Also attached to the offering memorandum was an escrow agreement to be signed by those individuals who chose to enter the transactions. There was also a copy of the purchase agreement, which in some instances was entitled purchase agreement and assignment, to be signed by the investor and Elmco and the assignment to be executed by the investors and by Elmco. Also attached was a copy of the purchase agreement between Elmco and the third-party lessor, the rights under which were to be assigned to the investor, and the lease agreement, whereby Elmco leased the property to the third-party lessor. The lease was a net lease providing for taxes and other costs in connection with the equipment to be paid by the *514 lessee. There was a provision that the lessee shall maintain the equipment in good operating condition and insure that it is currently the subject of an effective maintenance agreement with IBM or an agreement which is the substantial equivalent of an IBM maintenance agreement. The lease provided that it was assignable by the lessor without the consent of the lessee, but that it was not assignable by the lessee without the lessor's written consent. It provided for the sublease of the equipment by the lessee without the consent of the lessor, but that the lessee should not, without the lessor's written consent, enter into any sublease with any end-user lessee unless the terms and conditions are as favorable to lessee as the terms and conditions in the lessee's leases or subleases then being offered to others of similar equipment or extending beyond the term of this lease between the lessors and lessees. There was a definition of default and a statement of the remedies available to the lessor upon default and of the lessor's right to perform for lessee if the lessee failed to make payments. The lease provided for a security interest to secure payment of the rent and its other obligations, *515 the lessee granting to lessor a security interest in all of the lessee's contract rights and the proceeds thereof under subleases of the equipment subject to the lease, subject to prior assignments. Also included in the offering memorandum was a copy of equity promissory notes (Promissory Notes A and B), by which part of the down payment could be made. The first note was due within a few months after the closing of the transaction and the second note was due one year from the due date of the first note, both bearing 10-percent interest and both required to be secured by an irrevocable commercial letter of credit. Also attached to the offering memorandum was a draft of the secured limited recourse promissory note (installment note) which the investor was to sign. This note was in favor of Elmco and was signed by the individuals as tenants in common, severally and not jointly, in the proportion of their interest set forth in the schedule attached. The note provided for payment to Elmco (payee) of a principal sum, with the stated interest rate and the amount to be paid as interest for the year the transaction was entered into, and a monthly payment to be made for each of the following *516 108 months. Generally the first 24 months was at a lower rate than the following 60 months and the final 24 months at a lower rate than the 60 months, but higher than the first 24 months. The notes also provided that they were secured by security agreements covering the same equipment as is covered by the note and which notes and security agreements are referred to as "underlying debts". The note in the Fleischer case provided in part as follows: On December    , 1977, PAYEE executed a promissory note payable to the order of National Equipment Rental Ltd., in the principal sum of $    . On    , National Equipment Rental Ltd. executed a promissory note payable to     in the principal sum of    . These notes are secured by security agreements covering the same Equipment as is covered by this Note and which notes and security agreements herein are called the "Underlying Debt." The holder of this promissory Note, by accepting this promissory Note, agrees for itself and its heirs, successors and assigns, as follows: (a) It will duly comply with each and every of the obligations of the makers under the Underlying Debt and will not commit or suffer to be committed *517 any default under either of said instruments. (b) In the event a default occurs under the Underlying Debt, the undersigned has the right, but is not obligated, to cure such default and to deduct any sums paid to cure same from the principal indebtedness evidenced by this promissory note; Equipment Leasing & Management Company agrees to obtain the consent of National Equipment Rental Ltd. to timely notify Maker upon any event of default under the underlying Debt. (c) The holder of this promissory Note shall not make or permit to be made any prepayments under the Underlying Debt, except with the prior written consent (which consent shall not unreasonably be withheld) of the undersigned, subject to any early termination or default under any subleases of the Equipment entered into by the PAYEE, in which event PAYEE may refinance up to an amount necessary to pay off the Underlying Debt and reasonable costs incurred in connection therewith. (d) This promissory Note and the Security Agreement securing it are both executed pursuant to the Purchase Agreement and Assignment dated December    , 1977, between PAYEE, as the Seller, and MAKER, as the Purchaser, and each and every of the *518 representations and warranties contained in the Purchase Agreement and Assignment (including the Schedules thereto annexed) are incorporated herein by reference and made a part hereof with the same force and effect as if set forth herein verbatim, and shall survive payment, cancellation, and satisfaction of this promissory note and said mortgage. The installment notes for the various petitioners differ somewhat in their provisions. Paragraph (a) quoted above was not in most of the notes, but the remainder of the paragraphs quoted were, in substance, in most of the notes. All of the notes had an amount designated as recourse and the balance designated as nonrecourse. Also, all of them referred to and incorporated the purchase agreement and master lease agreement, which master lease, in each instance was assigned to the investor signing the note. They also all assigned a security interest in and to the equipment subject to all prior liens to Elmco as additional security for the note. Most of the notes, but not all of them, had a provision that in the event the master lease was terminated prior to the expiration of its term on account of default, then the entire unpaid principal *519 amount of the note, together with all interest accruing, should be deferred and not be due and payable until a specific date stated, which was after the termination of the original lease date. At the deferral date the provision was that all unpaid principal and accrued interest should become due and payable. The provision further required that to the extent the payor received any proceeds from the equipment following a termination of the lease it should be obligated to pay such proceeds to the senior lien holder on account of the debts secured by the senior items. In some cases there was a separate guarantee by the third-party lessor in connection with Elmco's leasing the computer property to it that it "absolutely and unconditionally guarantees to lessor, its successors and assigns, the prompt and unconditional performance by lessee of all of the terms thereof, it being expressly understood and agreed that this is a continuing guaranty and that the obligations of the undersigned hereunder are and shall be absolute under any and all circumstances." This guarantee further provided that its validity should not be terminated, affected or impaired, by reason of the assertion by the *520 lessor or its assignee, if any, of any rights or remedies which it may have under or with respect to either the lease, the equipment lease thereunder, or any other instrument executed in connection therewith or by reason of lessor's failure to exercise or delay in exercising any right or remedy available with respect to the guarantee. In most cases Elmco entered into a remarketing agreement with the third-party lessor. This agreement generally provided for either a fixed percentage (usually 10 percent), or a fixed amount after the investor had received a stated amount from proceeds of the sale of the equipment upon termination of the lease, that would be paid to the third-party lessor. These remarketing agreements varied in some respect but there were definite limitations with respect to the time they were in effect or the right of the purchaser to terminate them upon failure of performance within a specific time. In the general assignment of Elmco's rights to the investors these remarketing agreements were assigned to the investors. In some instances, there were written disbursement agreements which, in general, provided that instead of the third-party lessor paying the rents *521 to the investor, the investor paying the amount over to Elmco, and Elmco paying the amount over to the third-party lessor, that an offset could be made and only the amount of the lease payment in excess of the payment due by the investor to Elmco and by Elmco to the third-party lessor on the various notes would be by cash payment. The excess of the rentals (excess rents) over the required note payments were as a matter of convenience paid to Elmco and accumulated by Elmco for usually a period of a year and then paid over in one sum to the investor. Where there was no written disbursement agreement, generally there was such an oral agreement. Even where there was no specific agreement with respect to Elmco collecting the excess rentals and paying them over on a periodic basis to the investor, this function was performed by Elmco. When an investor signed a subscription agreement he agreed to sign the various notes and other documents provided by the offering memorandum. After acceptance by Elmco of the subscription agreements, these documents were executed by the investors and on behalf of Elmco. The installment notes of Elmco to the third-party lessors, which were in the same amount *522 and required the same payments as the installment notes of the investors to Elmco, were without recourse and were secured solely by the equipment subject to prior liens on the equipment. In all cases, Elmco as buyer, and the third-party lessor as seller, entered into a purchase agreement. In all instances this purchase agreement provided that the rights under the agreement were assignable and, in fact, they were assigned to the investors. Most of these purchase agreements between the third-party lessor and Elmco contained, among others, the following provisions -- 3.2 Discharge of Debts. Seller [third-party lessor] shall: (i) pay the debts secured by the Senior Liens in accordance with their terms, and (ii) at such time as the Notes have been paid in full, eliminate all liens; provided, however, that Seller may in good faith (at its expense) contest in any reasonable manner any such liens, but only to the extent that such contest does not adversely affect the title of Buyer to the Equipment. 4. Acknowledge Liens. Buyer agrees to execute and deliver any and all documents reasonably requested by Seller and the lender of any debt secured by a Senior Lien ("Lender") to *523 grant or confirm to Lender a first lien on the Equipment. 5. Indemnification. Seller will indemnify Buyer and any of its directors, officers, agents, employees and stockholders and hold them harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Buyer or any of its directors, officers, agents, employees or stockholders, may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in this Agreement or by reason of the Bulk Sales Laws of any jurisdiction. * * * * * * The agreement in the Diaz No. 1 transaction contained provisions as to assignment and certain indemnification agreements, but the provisions were worded substantially different from the above-quoted provision. Most of the purchase agreements between Elmco and the investors contained the following provisions: [3]
1.3 Assignment. Simultaneously with the sale of the Equipment to Buyer hereunder, Seller shall assign its rights under the Purchase Agreement, the Master Lease and the Remarketing Agreement to Buyer, subject and subordinate *524 to Senior Liens and the rights of the Underlying Lessee and the rights of Lessee's under the Master Lease; and the Buyer shall assume Seller's obligations under the Master Lease and the Remarketing Agreement. *525 * * * 3. Covenants of Seller.
* * * 3.2 Discharge of Debts. To the extent that Seller receives payment from Buyer under the Limited Recourse Note, Seller shall pay the debt secured by the Purchase Money Lien in accordance with its terms. * * * 5. Indemnification. Seller will indemnify Buyer and hold Buyer harmless from and against any and all loss, cost, damage, injury or expense, including, without limitation, reasonable attorney's fees, wheresoever and howsoever arising which Buyer may incur by reason of any material breach by Seller of any of the representations by, or obligations of, Seller set forth in this Agreement or by reason of the Bulk Sales Laws of any jurisdiction. * * * The following schedule shows, in the case of each petitioner, the amount of guaranteed income petitioner would receive through rental payments from the third-party lessor, the total disbursements, including down payment and equity notes, and principal and interest on the installment notes required to be made, and the amount of disbursements over guaranteed income in the case of each petitioner. Amount needed to be
recovered through rent
Guaranteed
Total
sharing and residual
Transaction
Income
Disbursements
value of equipment
Young
$    694,449.42
$    765,659.42
($ 71,210.00)
Fleischer
1,490,019.28
1,727,967.07
(237,947.79)
Diaz NO.1 &
Diaz MDPA
1,584,699.49
1,822,295.73
(237,596.24)
Diaz No.2
521,665.86
602,508.36
( 80,842.50)
Habersin No.1
572,386.62
641,648.62
( 69,262.00)
Habersin No.2
386,002.08
434,004.08
( 48,002.00)
Egurrola No.1
1,405,049.38
1,614,579.38
(209,530.00)
Egurrola No.2
1,982,743.20
2,208,259.20
(225,516.00)
Wilson No.1
2,417,982.90
2,646,930.90
(228,948.00)
Wilson No.2
1,383,787.50
1,517,972.50
(134,185.00)
Gentsch
2,537,625.96
2,887,181.96
(349,556.00)
Benson
665,867.00
725,636.90
( 59,769.90)
Lipman & Wu
701,126.04
773,825.96
( 72,699.92)
Miles
293,689.00
341,141.25
( 47,452.25)
Ribotsky
1,670,293.08
1,710,717.08
( 40,424.00)
Rosengarten
655,867.00
725,636.90
( 69,769.90)
Shore
1,062,081.60
1,188,729.60
(126,648.00)
Gold
775,878.72
859,358.72
( 83,480.00)
Richman
216,912.36
246,602.36
( 29,690.00)
Merchant
1,054,085.73
1,200,387.73
(146,302.00)
Filco & Liveco
2,086,100.88
2,316,738.88
(230,638.00)
Sikeston
1,933,954.20
2,187,070.20
(253,116.00)
Milgrom
528,312.55
620,961.05
( 92,648.50)
*526 Each petitioner, in order to break even or make a profit from the transaction, would need to received as rent sharing payments and residual value of the equipment at the termination of the lease, an amount equal to, or in excess of, the amount of disbursements made by that petitioner, less the guaranteed income. The following schedule shows, in the case of each petitioner, a reasonable estimate of the range of the amounts which might be expected to be received from rent sharing and from residual value of the equipment if it were sold at the conclusion of the third-party lessors lease, less a 10-percent remarketing fee and the total of such amounts. Equipment
Final residual
Rent
value less 10%
Transaction
Sharing
remarketing fee
Total
Young
$       0 - 35,945
$      120-394,055
* $ 120,000-425,000
Fleischer
59,800-104,000
90,000-187,000
149,800-291,000
Diaz No.1
59,638-130,325
81,000-247,000
140,638-377,825
Diaz No.2
58,683- 93,308
450- 34,650
59,133-127,958
Habersin No.1
64,066-109,327
26,550- 86,400
90,616-195,727
Habersin No.2
24,700- 44,200
0 - 32,400
24,700- 76,600
Egurrola No.1
39,128- 80,132
43,200-173,700
82,328-253,832
Egurrola No.2
57,200-156,000
0 - 99,000
57,200-255,000
Wilson No.1
81,000-142,500
0 -243,000
81,000-385,500
Wilson No.2
89,359-148,285
56,250-148,050
145,609-296,335
Gentsch
96,525-186,875
99,000-351,000
195,525-537,875
Benson
0
38,700- 97,200
38,700- 97,200
Lipman & Wu
0
17,100- 88,650
17,100- 88,650
Miles
85,760-128,640
128,000-256,000 ** 203,760-384,640
Shore
25,025- 75,850
37,800-108,900
62,825-184,750
Gold
20,475- 33,800
18,900- 75,600
39,375-109,400
Ribotsky
32,825- 77,025
58,500-143,100
91,325-220,125
Rosengarten
35,519- 66,278
44,100- 99,900
79,619-166,178
Richman
7,313- 15,763
13,050- 30,600
20,363- 46,363
Merchant
33,668- 71,918
22,950- 92,700
56,618-164,618
Filco & Liveco
36,075- 93,275
41,400-199,800
77,475-293,075
Sikeston
61,100-133,088
105,300-239,850
166,400-372,938
Milgrom
60,568- 86,505
11,700- 71,100
72,268-157,605
*527 In December of 1981, the third-party lessor in the Young case refused to pay the Youngs the amount of rent due them, above the note payments due by them to Elmco, as required by the terms of the master lease. Rather, the third-party lessor merely offset the payments due to it by Elmco with the payments due to the Youngs. The Youngs took this matter up with the lawyer who had represented Elmco. Under date of October 1, 1982, they wrote to this lawyer, stating in part, "Consistent with our recent conversation, please be advised that in the event CIG does not guaranty the lease payments required of CIG, GmbH and cure the default forthwith, I plan to institute a lawsuit against CIT and CIG, GmbH for recovery of all deficient lease payments, interest thereon, legal fees and court costs." Following the writing of this letter, in early October 1982, the Youngs engaged an attorney to represent them to enforce their rights in connection with the lease agreements with Computer Investors Group, Inc. et al. On January 24, 1983, Elmco *528 received a letter from CIG Marketing Corporation (the third-party lessor), regarding the credit on their note in 1982 of the amount of rent necessary to pay the note, leaving unpaid the excess of the rental. Sometime in 1983, the third-party lessor did pay the Youngs the excess amounts due. However, later the third-party lessor failed to pay a percentage of any sublease rental receipts it received beginning in December of 1983, to the Youngs, although the Youngs were entitled to such payments under the master lease. The Youngs looked into the financial situation of the third-party lessor and decided not to attempt to enforce the rent sharing agreement because the financial situation of the third-party lessor had deteriorated and they did not want to chance having any default on the lease payments credited through to pay up the various notes. In connection with the default in payment of the excess rentals, the Youngs were informed of the third-party lessor's default in July 1982, and notified the third-party lessor of this default on August 3, 1982. The equipment owned by the Youngs was actually located with an end-user lessee in Germany. The Youngs were of the opinion, and had *529 been informed by individuals engaged in computer leasing, that the residual value of the equipment in Germany, either to extend the lease period or for sale, would be greater than in the United States. The following schedule shows, with respect to most petitioners for each of the years here involved, the income from the computer transaction reported by that, or those petitioners, on their tax returns, the depreciation deduction claimed, the interest deductions claimed, and as to all petitioners the loss claimed from the transaction. Robert S. and Kimberly C. Young
Income
Year
Income
Depreciation
Interest
[Loss]
1978
$  3,596
[$  25,650]
[$  3,596]
[$  25,650]
1979
53,453
[  146,205]
[  42,664]
[  135,416]
1980
53,454
[   88,994]
[  41,535]
[   77,075]
1981
82,907
[   88,994]
[  38,967]
[   45,054]
1982
82,908
[   88,994]
[  34,524]
[  40,610]
Total losses claimed: 1978 - 1982
[$ 323,805]
Frank N. and Barbara C. Fleischer
Income
Year
Income
Depreciation
Interest
[Loss]
1977
$ 35.47
[$ 9,300]
[$ 35.47]
[$ 9,300]
*530 Osvaldo and Zoraida Diaz
Losses claimed 1978-1982:
1978
[$  19,950]
1979
[  120,395]
1980
[   76,940]
1981
[   54,169]
1982
[  100,500]
Total losses claimed:
[$ 371,954]
Arthur and Joan Habersin
Income
Year
Income
Depreciation
Interest
[Loss]
1980
$ 35,925
[$ 50,835]
[$ 35,925]
[$ 50,835]
1981
19,950
[  35,585]
[  21,084]
[  36,719]
Total Losses claimed: 1980-1981
[$ 87,554]
Jorge Egurrola
Losses claimed 1978-1981:
1978
[$ 28,651]
1979
[  50,498]
1980
[  33,982]
1981
[  16,777]
Total losses claimed:
[$ 129,908]
Ann and John L. Wilson
Ann Wilson:
Income
Year
Income
Depreciation
Interest
[Loss]
1979
$ -0-
[$ 40,000]
$ -0-
[$ 40,000]
1980
11,509
[  45,300]
[ 9,550]
[  43,341]
1981
14,618
[  33,210]
[11,738]
[  30,330]
1982
14,519
[  24,372]
[12,320]
[  22,173]
Total Losses claimed: 1979-1982
[$ 135,844]
John L. Wilson:
Income
Year
Income
Depreciation
Interest
[Loss]
1979
$  3,585
[$ 40,000]
[$ 3,585]
[$ 40,000]
1982
14,619
[  24,372]
[12,320]
[  22,073]
Total losses claimed: 1979 and 1982
[$ 62,073]
*531 Thomas O. and Betty F. Gentsch
Income
Year
Income
Depreciation
Interest
[Loss]
1978
$      658
[$ 148,125]
[$     658]
[$ 148,125]
1979
91,636
[  251,813]
[  82,293]
[  242,470]
1980
91,637
[  176,269]
[  77,018]
[  161,650]
1981
155,077
[  164,517]
[  72,651]
[   82,091]
Total losses claimed: 1978-1981
[$ 634,336]
Joel and Ellen S. Benson
Income
Year
Income
Depreciation
Interest
[Loss]
1981
$  1,660
[$  59,250]
[$ 1,660]
[$ 59,250]
1982
19,920
[  100,725]
[10,000]
[  90,805]
Total losses claimed: 1981 and 1982
[$ 150,055]
Charles A. Lipman
Income
Year
Income
Depreciation
Interest
[Loss]
1979
$ 12,004
[$ 28,917]
[$ 12,004]
[$ 28,917]
1980
26,619
[  22,491]
[  11,440]
[   7,312]
Total losses claimed: 1979 and 1980
[$ 36,229]
Joe J. And Elaine P. Miles
Income
Year
Income
Depreciation
Interest
[Loss]
1977
$     608
[$ 39,713]
[$     608]
[$ 39,713]
1978
14,579
[  67,511]
[  14,767]
[  67,699]
1979
14,580
[  47,258]
[  14,580]
[  47,258]
1980
35,483
[  44,107]
[  14,275]
[  22,899]
1981
35,934
[  44,107]
[  14,277]
[  22,450]
Total losses claimed: 1977 - 1981
[$ 200,019]
*532 Marvin and Harriet Ribotsky
Limitation on
Investment Interest
Income
Year
Income
Depreciation
Interest
Expense Deduction
[Loss]
1980
$ -0-
[$ 50,000]
$ -0-
--
[$ 50,000]
1981
39,016
[  85,000]
[39,016]
[$ 21,829]
[  63,171]
1982
38,977
[  59,500]
[35,977]
[  25,404]
[  34,096]
Total losses claimed: 1980-1982
[$ 147,267]
Edward and Katherine Rosengarten
Income
Year
Income
Depreciation
Interest
[Loss]
1981
$  1,660
[$ 59,250]
[$  1,660]
[$ 59,250]
1982
19,520
[100,725]
[  10,000]
[  91,205]
1983
19,920
[ 70,508]
[   5,000]
[  55,588]
Total losses claimed: 1981 - 1983
[$ 206,043]
Osvaldo Diaz, M.D., P.A.
FY Ended
Losses
10/31/78
[$ 45,247]
10/31/79
[  36,616]
10/31/80
[  28,934]
10/31/81
[  29,547]
Total losses claimed: FY 10/31/78 - 81 [$ 140,344] Chang You and Elizabeth Wu
Income
Year
Income
Depreciation
Interest
[Loss]
1977
$      33
[$ 24,300]
-0-
[$ 24,267]
1978
12,004
[  41,310]
[$ 12,004]
[  41,310]
Total losses claimed: 1977 and 1978
[$ 65,577]
*533 Larry and Bonnie Shore
Income
Year
Income
Depreciation
Interest
[Loss]
1980
$ -0-
[$ 102,900]
-0-
[$ 102,900]
1981
80,086
[  174,930]
[$ 80,086]
[  174,930]
1982
80,086
[  122,451]
[  80,086]
[  122,451]
Total losses claimed: 1980 - 1982
[$ 400,281]
Steven Gold
Income
Year
Income
Depreciation
Interest
[Loss]
1981
$ 14,618
[$ 25,532]
[$ 14,618]
[$ 25,532]
1982
14,618
[  17,872]
[  14,618]
[  17,872]
Total losses claimed: 1981 and 1982
[$ 43,404]
Paul T. and Elaine Richman
Income
Year
Income
Depreciation
Interest
[Loss]
1980
$ -0-
[$ 21,750]
$ -0-
[$ 21,750]
1981
16,199
[$   36,975]
[16,199]
[  36,975]
Total losses claimed: 1980 and 1981
[$ 58,725]
Harold and Helen Gold
Income
Year
Income
Depreciation
Interest
[Loss]
1980
$ -0-
[$ 51,731]
$ -0-
[$ 51,731]
1981
50,349
[  87,943]
[56,403]
[  93,637]
1982
50,349
[  61,561]
[50,349]
[  61,561]
Total losses claimed: 1980 - 1982
[$ 206,929]
*534 Merle W. and Jean C. Merchant
Income
Year
Income
Depreciation
Interest
[Loss]
1981
$  6,028
[$ 101,250]
[$  6,037]
[$ 101,259]
1982
81,494
[  148,500]
[  85,904]
[  152,910]
Total losses claimed: 1981 and 1982
[$ 254,169]
Filco, Ltd.
Income
FY Ended
Income
Depreciation
Interest
[Loss]
2/28/81
$ -0-
[$ 157,500]
$ -0-
[$ 157,500]
2/28/82
-0-
[  267,750]
-0-
[  267,750]
2/28/83
-0-
[  187,425]
-0-
[  187,425]
Total losses claimed: FY 2/28/81-83
[$ 612,675]
Liveco, Inc.
FY Ended
Income [Loss]
2/28/82
[$ 91,956.00]
Sikeston Motel Corporation
FY Ended
Income [Loss]
9/30/81
[$ 212,000]
9/30/82
[  232,461]
9/30/83
[106,816]
Total losses claimed: FY 9/30/81-83 [$ 551,277] David L. Milgrom
Income
Year
Income
Depreciation
Interest
[Loss]
1982
$  1,817
[$ 28,575]
[$ 1,817]
[$ 28,575]
1983
18,722
[  41,910]
-0-
[  23,188]
Total losses claimed: 1982 and 1983
[$ 51,763]
*535 Respondent in his notices of deficiency to each of the petitioners disallowed the claimed losses from the computer equipment leasing transaction, or transactions, with explanations generally to the effect that petitioners had not established that they were entitled too the claimed loss deductions. At the trial, respondent filed an amendment to his answer in each case to allege that each petitioner had failed to show that he was at risk, within the meaning of section 465, with respect to any amount other than the cash equity down payment and the equity notes given as down payment on the purchase price of the equipment. Respondent specifically alleged that each petitioner was protected against loss on all amounts due under their installment notes through guarantees, stop loss agreements, or other similar arrangements, and further, that each petitioner was not "at risk" under section 465(b)(3) because the notes were, in effect, payable to the third-party lessor who had an interest other than as a creditor in the activity. OPINION Respondent takes the position that the transactions between Elmco and the Youngs, and Elmco and the Miles, lacked economic substance and that each transaction *536 was entered into solely for tax avoidance and should be disregarded entirely as a sham. Respondent argues that petitioners in each of the transactions involved in these consolidated cases other than Habersin No. 1, Wilson No. 2, Ribotsky, Fleischer, Milgrom, Filco & Liveco and Sikeston, entered into their respective transaction or transactions with no actual and honest intention of making a profit therefrom. Respondent argues that petitioners claiming deductions relating to equipment purchased pursuant to the Wilson No. 1 transaction, the Wilson No. 2 transaction, and the Diaz No. 1 transaction, have failed to establish that they had a depreciable interest in the equipment purchased pursuant to a valid indebtedness. Respondent argues that if the transactions involved in any or all of these cases are to be properly recognized, petitioners in each of the transactions in issue other than the Fleischers, Diaz No. 1, Benson, and Rosengartens were protected against loss on all amounts due under their respective long-term installment notes through guarantees, stop loss agreements, or other similar arrangements, and therefore, are not entitled to be considered at risk with respect to *537 any portion of their long-term installment notes. Finally, respondent contends that neither Elmco nor CTC was a substantive party to the transactions. It is respondent's position that either Elmco or CTC was inserted in the chain of title and the long-term note obligations as a straw man rather than a substantive participant. Respondent argues that each of petitioners' long-term notes are in effect payable directly to the third-party lessor and that the third-party lessor had an interest other than as a creditor in the transactions. On this basis, respondent contends that each petitioner's long-term note was not "at risk" under section 465(b)(3). Finally, respondent takes the position that each petitioner is liable for the increased interest rate pursuant to section 6621(c) and that petitioners against whom additions to tax under section 6661(a) were determined are liable for that addition. In many cases this Court has considered the issue of whether computer equipment sale/leaseback transactions similar to those involved in the instant case should be recognized for Federal income tax purposes. The determination is a factual one, Larsen v. Commissioner,89 T.C. 1229, 1252-1253 (1987). *538 Merely because a taxpayer enters into a transaction with one of its purposes being tax reduction does not cause that transaction not to be recognized for Federal tax purposes. If the form of the transaction reflects its substance and the sole purpose of the transaction is not tax avoidance, generally the transaction will be recognized for Federal tax purposes. Gregory v. Helvering,293 U.S. 465 (1935). A transaction that has genuine economic substance and conforms with business realities will be respected for tax purposes. Frank Lyon Co. v. Commissioner,435 U.S. 561, 584-585 (1978). In Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91, (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983), it was stated that a sale/leaseback transaction should be disregarded for Federal income tax purposes if it is determined that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction and that the transaction has no economic substance because no reasonable possibility of a profit exists. In Torres v. Commissioner,88 T.C. 702, 718 (1987), *539 we pointed out that based on the standards in Rice's Toyota World, Inc. v. Commissioner, supra, a finding of lack of economic substance is inappropriate if either a business purpose or a reasonable possibility of profit apart from the expected tax benefits is found to have been present. In Mukerji v. Commissioner,87 T.C. 926 (1986), we held that the transaction there involved should be recognized for Federal income tax purposes. The record in the Mukerji v. Commissioner, supra, case showed: (1) that the taxpayer paid an amount approximately equal to or below fair market value for the equipment, and (2) that the anticipated cash flow received by the taxpayer during the time the lease on the equipment was in effect, plus the reasonably to be expected residual value of the equipment at the end of the lease, exceeded the amount of cash investment made by the taxpayer. From these facts, we concluded that the transaction had a realistic possibility of economic profit. In Gefen v. Commissioner,87 T.C. 1471 (1986), we stated that "tax consequences cannot depend on unrealistic demands for certainty." We accepted as reasonable *540 an appraiser's estimated residual value at the conclusion of the lease there involved of 20 percent of the equipment's cost even though, because of unexpected actions by the manufacturer, the equipment actually had no value at the termination of the lease. In holding as we did, we pointed out that it was the potential for profit at the time the transaction was entered into that demonstrated its economic substance. Judged by the standards of the cases above discussed, in our view, all of the sale/leaseback transactions in each of these cases should be recognized for tax purposes. The parties stipulated that the amount paid by each petitioner for the equipment purchased was its fair market value. Petitioners produced a well-qualified expert witness who testified to the residual value of the equipment at the termination of the lease. He also gave his opinion of the expected shared rentals to be received by each petitioner. In all cases, the top range was in excess of the amount of petitioner's cash investment in the computer equipment. In some instances, his low range was in excess of petitioner's cash investment. Respondent did not cross-examine petitioners' expert witness nor *541 did respondent's expert criticize his method of valuation or his conclusions. In fact, in most instances where respondent's expert gave an opinion as to the residual value of the computer equipment at the termination of the lease, his estimated value fell within the range of the values of petitioners' expert witness. [4]
Although we rely on the residual values of the equipment, as well as the expected return from rent sharing payments determined by petitioners' expert whose testimony was offered at the trial, it should be pointed out that with the offering memorandum in each case was submitted an appraisal by a person (Mr. Norris) whose credentials, as written up in the offering memorandum, appeared to qualify him to make reasonably accurate predictions of residual value. The residual values determined by Mr. Norris, who gave the appraisals with the offering memorandum, in every instance were well in excess of the amount needed to afford petitioners the opportunity *542 for a profit. Even though Mr. Norris was not a witness at the trial, we believe the values he predicted to have relevance with respect to whether the transactions should be recognized for tax purposes. The relevance of these valuations is the influence they might have on petitioners' subjective intent in entering into the transactions. From the testimony, we conclude that each petitioner did have an intent to make a profit from the transaction. Since we have found an objective reasonable possibility of profit in each transaction, under the holding in Rice's Toyota World, Inc. v. Commissioner, supra, and Torres v. Commissioner, supra, the transaction is to be recognized for tax purposes regardless of petitioner's subjective intent. In connection with the transaction between Elmco and the Youngs, the report of petitioners' expert, Mr. Lyon, is not completely clear. His conclusion with respect to the anticipated value in excess of disbursements by the Youngs is that it would range from $ 120,000 to $ 450,000. However, an addition of the individual items forming the estimate does not come to this amount. It is our opinion that the intent of the *543 witness was to give as his opinion of the residual value plus receipts from rent sharing the total value stated in his report, and we have accepted that value. However, even an addition of the individual items found in the report results in a sufficient amount to show some anticipated profit to the Youngs from the transaction. Based on this record as a whole we conclude that none of the sale/leaseback transactions are to be disregarded for Federal tax purposes as being a sham totally lacking in business purpose or economic substance. Respondent's argument that the record does not show in the transactions in Wilson No. 1, Wilson No. 2 and Diaz No. 1 that the purported purchasers had a depreciable interest in the equipment is not supported by the record. The documents received in evidence at the trial with respect to these three transactions were stipulated as being complete, but actually were incomplete. Subsequent to the trial, the Court granted petitioners' motion to receive the complete documents. The complete documents in each instance show that each petitioner did have an interest in the equipment purchased and the amount of that interest. Therefore, respondent's argument *544 to the contrary based on imcomplete documents is not well taken. Section 465(a) provides that in a transaction involving section 1245 property which is leased, any loss for the taxable year shall be allowed only to the extent that the taxpayer is at risk with respect to the activity at the close of the taxable year. Section 465(b) [5] provides that a taxpayer is at risk for the amount of money and his basis in property contributed to an activity, plus borrowed amounts for which he is personally liable or which are secured by property, other than property used in the activity, to the extent of the value of the other property. Specifically excluded from "at-risk" amounts are amounts borrowed from a person who has an interest in the activity other than as a creditor and amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements and similar arrangements. *545 Clearly in the case of each of petitiooers here involved, the amount of cash paid with respect to the transaction, and the amount of equity notes which were fully recourse and, in most cases, secured by an irrevocable letter of credit, are amounts for which petitioner was at risk under section 465(b). The issue, in connection with the "at-risk" provisions is to what extent, if any, petitioners were at risk with respect to the part of the long-term installment note which was stated to be recourse. As we pointed out in Porreca v. Commissioner,86 T.C. 821, 838 (1986), the legislative history of section 465 does not define what is meant by "other similar arrangements," but does state that "it does evidence concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable." Here, the entire setup of the transaction is strongly indicative that none of these petitioners would ever be called upon to pay any portion of their long-term installment notes whether stated to be recourse or not. The underlying indebtedness with which Elmco purchased the *546 equipment was nonrecourse. The third-party lessor had an indebtedness to a bank for the purchase price of the equipment and the bank had a first lien on the equipment to secure that indebtedness. When Elmco or CTC purchased the equipment from the third-party lessor it made some cash down payment and its purchase money note was nonrecourse. Also Elmco leased the equipment back to the third-party lessor for rental payments equal to or in excess of the payments due to the third-party lessor. When Elmco sold the "package" to investors, it assigned its rights under the lease including the payment of the rent to the investor. Pursuant to a written or oral agreement, no part of the rent payments were actually made to anyone by the third-party lessor, except the amount in excess of the note payments due to the third-party lessor by Elmco. These note payments were in the exact same amount as the note payments due by the investor to Elmco. The third-party lessor credited the rent amount due on it, and credited its note from Elmco with an equal amount. Periodically, but at least once a year, the excess, if any, of the rentals over the note payments was paid by the third-party lessor to Elmco *547 and transferred by Elmco to the investor. The payments on each petitioner's "partial recourse" note and Elmco's nonrecourse note were made with the rental payments. Since there was no recourse on the note payments due by Elmco to the third-party lessor, if the user-lessee stopped paying the rent, the third-party lessor could not force collection, the equipment could not be again leased and if the third-party lessor defaulted on its rental payments, it would in effect merely cease paying itself. If the third-party lessor had paid off its notes to the bank which had the first lien on the equipment for a purchase money loan or continued to pay on that loan, nothing would change except the excess payments if any which were due to the investor. If the third-party lessor had not paid off the bank notes and ceased to pay the bank, its loan might well be satisfied by the sale of the equipment. Under this circumstance, Elmco's indebtedness would be discharged since its notes to the third-party lessors were nonrecourse. It is unrealistic to believe Elmco would make any attempt to collect on the investors' note to it since under these circumstances, Elmco would be in no different financial *548 situation than it was while the various book entries were being made. In fact, when Mr. Meadows, the President of Elmco testified, he would not say that Elmco would attempt to make such a collection to its unjustified enrichment but rather argued that Elmco would have a right to do so. We will therefore consider whether, in fact, considering all the documents signed by the parties in the cases, Elmco would have any such right to collect the "recourse" part of the installment notes from the investors. The real indebtedness in this case is the indebtedness underlying petitioners' indebtedness. However, in all cases except the Diaz No. 1 transaction, there are further specific indemnity provisions in the record. [6] In the case of the Youngs and a number of other cases, there was assigned along with the lease assignment to petitioner, a guaranty given to Elmco by the third-party lessor or the parent of the third-party lessor. That guaranty specifically provided that -- the undersigned [Computer Investors Group, Inc.] hereby absolutely and unconditionally guarantees to lessor [Elmco] its successors and assigns, the prompt and unconditional performance by lessee [CIG-Computers *549 GMBH, a subsidiary of Computer Investors Group, Inc.] of all terms thereof [terms of the lease] being expressly understood and agreed that this is a continuing guaranty and the obligations remaining hereunder are, and shall be, absolute under any and all circumstances. The guaranty further provided that it should not be impaired or affected by any other rights or remedies being exercised by the lessor and that it should remain in full force and effect as to any modifications, extensions, or renewal of the lease, and that upon lessee's default under the lease, lessor shall give the undersigned written notice to cure it within ten days, but failing to cure such default within the ten day period, the lessor or its assignee may at its option proceed *550 directly and at once without additional notice against the guarantor to collect and recover the full amount of the liability. Several cases had guarantees similar to the one in the Young case. As set forth in our findings of fact, there was a similar guarantee by Elmco in the long-term installment note in the Fleischer case. In the cases of other petitioners, where the separate guaranty is not present, the purchase agreement between Elmco and the third party lessor contains a section entitled Representations and Warranties, by which the third-party lessor warrants that the purchase agreement, the lease and other documents, constitute valid and binding obligations of the third-party lessor enforceable in accordance with their terms, except as may be limited by bankruptcy or similar laws relating to creditor's rights. This language is in documents entered into between Elmco and the third-party lessor, the rights under which were assigned to petitioners. As heretofore pointed out, the third-party lessor is both liable to make the payments with which the investors' payments to Elmco are made, and to discharge its liability under the purchase agreement or additional warranty. However, *551 this additional warranty does give a further indemnification to the investor. Since the actual money payments on the lease are coming from the user-lessees, the representation of the third-party lessor that the third-party lessor warrants, covenants and agrees, that the master lease constitutes the valid and binding obligation of the third-party lessor, is in effect an indemnification that payments will be made by the third-party lessor in case of any nonpayment by the user-lessee. In addition to the Warranties assigned to the investor by Elmco, in most cases Elmco in the purchase agreement agreed to "indemnify Buyer [investor] and hold Buyer harmless from" any loss which buyer may incur by reason of any material breach by Elmco of any of its obligations set forth in the purchase agreement. In the purchase agreement Elmco had covenanted to pay the debt secured by the purchase money lien to "the extent that Seller [Elmco] receives payment from Buyer [investor] under the Limited Recourse Note." Under this agreement, if Elmco's obligation on its nonrecourse purchase money note to the third-party lessor was discharged in full by distraint on and sale of the equipment, Elmco would *552 have to pay over any amount it got from the investors to the third-party lessors even though the third-party lessors' rental payments to the investors were to be used to pay the investors' notes to Elmco and Elmco's notes in the identical amounts to the third-party lessors. Certainly in these circumstances the payments to the third-party lessors would have to be returned to the investors. In our view the various above-referred to indemnifications and warranties off the third-party lessors and Elmco to the investors would result in a total discharge of Elmco's liabilities to the third-party lessor which would be considered payment by the investors of their notes to Elmco. In our view this is an "other similar arrangement" protecting the investors from loss within the meaning of section 465(b)(4). The facts here are similar to those in Larsen v. Commissioner,89 T.C. 1229, 1273 (1987), in which we held that an indemnity in the purchase agreement executed by the parties was an "other similar arrangement" protecting the taxpayer from loss within the meaning of section 465(b)(4). In that case, we stated at page 1273 -- Where a taxpayer's debt obligation constitutes *553 only a secondary liability under which the taxpayer has a right of reimbursement against the primary obligor, the taxpayer will not be treated as at risk with respect to any such obligation, as such reimbursement is regarded as protection against loss within the meaning of section 465(b)(4). Peters v. Commissioner,89 T.C. 423 (1987); Brand v. Commissioner,81 T.C. 821, 828 (1983). As petitioners pointed out in their brief, the indemnification in the contracts in the Larsen v. Commissioner, supra, case were with respect to assumption agreements. It is true that the installment notes here involved were not designated as assumption agreements. However, considering the facts present and the various agreements and assignments entered into in connection with the transaction, in substance, the installment notes amount to no more than an assumption by the investor of Elmco's notes to the third-party lessor. In our view in these cases the various rights assigned to the investors plus their indemnification against loss by Elmco causes petitioners' liabilities on the installment notes in substance to be only secondary liabilities on Elmco's *554 nonrecourse notes. The facts here show that except for the down payment including the equity notes secured by letters of credit, petitioners "are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable." Porreca v. Commissioner,86 T.C. at 838. This is exactly the situation to which section 465(b) was directed. Under the facts of this case it appears that there was no business purpose for the recourse liability contained in the installment notes from petitioners to Elmco. The underlying indebtedness was nonrecourse. We are not aware that Mr. Meadows testified that he wanted the recourse liabilities in these notes because it would be a leverage to have payment made on the equity notes and further that at some juncture he might want to use these notes as security at a bank to borrow money to pay off his note to the third-party lessor if there was an interest rate reduction and thereby profit on the difference in interest rates. The first reason given is very weak since the equity notes were generally guaranteed by irrevocable letters of credit and generally were paid within one *555 year. Those notes were so fully guaranteed we are unimpressed by this reason given by Mr. Meadows. We are equally unimpressed by the second reason given by Mr. Meadows. Because of the circular nature of the transactions and the nonrecourse nature of Elmco's liability to the third-party lessors, any use of these notes as security for Elmco to borrow money to pay off its nonrecourse notes is highly improbable. The notes recite that they are purchase money notes and some of the background of the transaction is set forth in them. Under these circumstances it is very doubtful that a bank would accept these notes as security for a loan to Elmco. An official of a bank would look at the same facts we have discussed and question the enforceability of the recourse part of the notes if Elmco were relieved of its liability on its nonrecourse notes. We therefore hold, that in all cases the recourse portion of the notes were not at risk since there was another similar arrangement which indemnified the investors against liability on the stated "recourse" parts of the notes. In holding as we do we recognize that the papers were somewhat different in the different transactions. However, in *556 considering all the agreements in each of the transactions, we conclude that the result is the same in each. Based on the documents in each of the transactions, we conclude in substance under the "worst-case scenario," these investors were not the obligors of last report. Melvin v. Commissioner,88 T.C. 63, 75 (1987). They were "effectively immunized from any realistic possibility of suffering an economic loss" other than their own payment. Porreca v. Commissioner, supra.[7]
Respondent finally argues that Elmco played no useful role in the transactions and was merely a straw man. He contends that the indebtedness should be considered as *557 going directly from the investors to third-party lessor. He further contends that the third-party lessor had an interest other than as a creditor in the transaction within the meaning of section 465(b)(3). The record shows that Elmco did in fact serve a purpose by putting together the packages for the various leasing company and finding the investors to invest in those transactions. It is obvious that this might have been done by Elmco on a fee basis rather than through the system used to Elmco purchasing the equipment from the third-party lessor on a nonrecourse note, leasing it back to the third-party lessor, selling it to the investors, taking a partial "recourse" note from the investors, and assigning the lease payment to the investors, which lease payments were used in a circular manner to pay Elmco's notes. In our view the primary if not sole reason the transaction took the form it did rather than a fee to Elmco, was an attempt to convert a part of the nonrecourse purchase money notes to recourse while putting provisions in the various documents to guarantee petitioners against any loss. This record discloses no other useful purpose served by Elmco in putting the transaction *558 together as it did. Its profit came from the differential between what it paid to the third-party lessor as down payments on the equipment and what the investors paid to Elmco as down payments. In substance this differential was a fee. We agree with respondent that Elmco's place in the various transactions as framed was primarily to attempt to make installment notes on which petitioners were not at risk appear to be at risk. The substance of the transactions were that the investors had merely assumed Elmco's nonrecourse liability to the third-party lessors. We have therefore considered respondent's argument with respect to Elmco's place in the transactions in conjunction with his argument that petitioners were protected from loss under arrangements similar to a guarantee or stop loss agreement. We hold that each petitioner is entitled to the losses incurred in these transactions to the extent of the cash down payment plus the recourse equity notes signed by that petitioner and that none of the petitioners are entitled to losses based on the part of their long-term installment notes designated as "recourse." Section 6621(c)[8] [previously designated section 6621(d) of the Internal Revenue Code *559 of 1954] provides for an increased rate of interest of 1200% of the underpayment rate on any substantial underpayment which is attributable to tax motivated transactions. The increased rate is applicable for interest accruing after December 31, 1984. A "substantial underpayment" is an underpayment greater than $ 1,000.00. Section 6621(c)(2). A loss disallowed by reason of 465(a) is specifically included in the definition of tax motivated transactions. Section 6621(c)(3)(A)(ii). [9] We have concluded in each of these cases that part of the underpayment is attributable to petitioners' losses which are disallowed as a result of the application of section 465. If the losses with respect to the sale/leaseback transaction create an underpayment in excess of $ 1,000.00 as to any petitioner that petitioner is liable for the 6621(c) addition with respect to the amount of the underpayment due to the losses disallowed by reason of section 465(a). *560 Respondent determined that each of petitioners in the Rosengarten, Stephen Gold, Ann Wilson, Harold Gold and Merchant cases was liable under section 6661 for the addition of tax for the substantial understatement of liability under section 6661. [10] This section provided for an addition to tax equal to 25 percent of an underpayment attributable to a substantial understatement. A substantial understatement is an understatement which exceeds the greater of 10 percent of the tax required to be shown on the return for that year or $ 5,000. Section 6661(b)(1)(A). For purposes of section 6661(b)(1), an "understatement" is defined as the excess of the tax required to be shown on the return over that actually shown. Section 6661(b)(2)(A). Petitioners only contention with respect to the addition to tax under section 6661 is that it applies only if the Court accepts one of the positions taken by respondent. Petitioner effectively admits that this addition is applicable if we decide the section 465(b) issue for respondent. *561 Based on the facts in this case, we hold that each of petitioners against whom respondent determined an addition to tax under section 6661 is liable for that addition to tax for substantial understatement of liability if upon recomputation under Rule 155 the understatement exceeds the greater of 10 percent of the tax shown on the return or $ 5,000. [11]
Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert S. Young and Kimberly C. Young, dockets Nos. 15257-82, 9423-83, 8309-53; Frank N. Fleischer and Barbara C. Fleischer, docket No. 1077-83; Osvaldo Diaz and Zoraida Diaz, docket Nos. 21344-83, 8355-85; Estate of Arthur J. Habersin, Deceased, Richard C. Carter, Personal Representative and Joan Habersin, docket No. 35765-83; Jorge Egurrola, docket Nos. 10117-84, 39325-84; Ann Wilson, docket Nos. 24241-84, 38121-85; Thomas O. Gentsch and Betty F. Gentsch, docket Nos. 31239-84, 33572-85; Joel Benson and Ellen S. Benson, docket No. 31748-84; John L. Wilson, docket Nos. 35720-84, 19726-85; Charles A. Lipman, docket No. 431-85; Joe J. Miles and Elaine P. Miles, docket No. 3139-85; Marvin Ribotsky and Harriet Ribotsky, docket No. 5422-85; Edward Rosengarten and Katherine Rosengarten, docket No. 8693-85; Osvaldo Diaz, M.D., P.A., docket No. 15867-85; Chang You Wu and Elizabeth Wu, docket No. 20272-85; Larry Shore and Bonnie Shore, docket No. 26324-85; Steve Gold, docket No. 28022-85; Paul T. Richman and Elaine Richman, docket No. 34422-85; Harold Gold and Helen Gold, docket No. 39657-85; Merle W. Merchant and Jean C. Merchant, docket No. 40466-85; Filco, Ltd., docket No. 42407-85; Liveco, Inc., docket No. 42539-85; Sikeston Motel Corporation, docket No. 42540-85; Edward Rosengarten, docket No. 2869-86; David C. Milgrom, docket No. 8120-86. ↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. Subsection (d) of sec. 6621↩ was redesignated subsection (c) and amended by the Tax Reform Act of 1986, sec. 1511(c)(1)(A)-(C), Pub. L. 99-514, 100 Stat. 2744. 1. The Norris Report for the Gentsch transaction provides projected rentals of the equipment only for a one-year period. The master lease provided that petitioner is entitled to receive 50 percent of the excess net rentals, if any, for the last two↩ years of the lease. 2. The Norris Report for the Sikeston transaction provides projected rentals of the equipment only for a one-year period. The master lease provides that petitioner is entitled to receive 50 percent of the excess net rentals, if any, for the last two↩ years of the leases. 3. The purchase agreement and assignment in the Fleischer case contained provisions in substance the same as "1.3 Assignment" but did not contain "5. Indemnification" in the agreement. In the Benson case, the purchase agreement contained the provision in "5. Indemnification" but not "1.3 Assignment." However, Benson's agreement was with CTC which assigned its rights to Benson. Elmco had unconditionally guaranteed to the third-party lessor the performance of CTC's obligations. The Rosengarten purchase agreement had a provision in substance the same as "5. Indemnification," quoted above. The lease of equipment and security agreement in the Rosengarten case are between the third-party lessor as lessee, and Rosengarten as lessor, although there is in the record, a purchase agreement between CTC and the third-party lessor, whereby the third-party lessor sells the equipment to CTC and leases it back. This purchase agreement has an indemnification agreement by the third-party lessor similar to that in most cases. There is also a nonrecourse purchase money note of CTC to the third-party lessor and most of the other documents found in the other cases. ↩
*. The addition here is not exact, but this was the opinion given by the expert. ** This is for the entire transaction. Mr. Miles had a 15-percent interest. ↩
4. In a number of the cases respondent makes no argument that the transaction should not be recognized for tax purposes. However, respondent in these cases does not concede that the transactions should be recognized. ↩
5. Section 465(b) states in pertinent part as follows: (b) Amounts Considered At Risk. -- (1) In General. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) Borrowed Amounts. -- For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1). (3) Certain Borrowed Amounts. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b). (4) Exception. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. ↩
6. Respondent states that such provisions were not in the Benson and Rosengarten purchase agreements, but a review of these agreements discloses that they did contain these provisions. In the Fleischer case there was no specific indemnity provision in the purchase agreement, but actually the record shows that in that case the indemnity provision was in the note from Fleischer to Elmco which we have quoted in our findings of fact.↩
7. The parties stipulated to separate documents in each of these 32 cases. In each case the documents are 3 to 4 inches thick and consist of several hundred pages. In "finding the fact stipulated" we have found the facts in each set of documents even though the particular document is not quoted or summarized in our findings. We do not consider it necessary to set forth the various differences in the documents in our findings in view of our conclusion that in substance they framed similar transactions. ↩
8. Section 6621(c) reads as follows: (c) INTEREST ON SUBSTANTIAL UNDERPAYMENTS ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- (1) IN GENERAL. -- In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the annual rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection. (2) SUBSTANTIAL UNDERPAYMENT ATTRIBUTABLE TO TAX MOTIVATED TRANSACTIONS. -- For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" mean any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $ 1,000. (3) TAX MOTIVATED TRANSACTIONS. -- (A) IN GENERAL. -- For purposes of this subsection, the term "tax motivated transaction" means -- (i) any valuation overstatement (within the meaning of section 6659(c)). (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudlent transaction.↩
9. See Landsburgh v. Commissioner,T.C. Memo. 1987-491, for application of section 6621(c)↩ to an underpayment resulting from a loss disallowed by reason of 465(a). 10. Section 6661 reads in pertinent part as follows:
(b) Definition and Special Rule. -- (1) SUBSTANTIAL UNDERSTATEMENT. -- (A) IN GENERAL. -- For purposes of this section, there is a substantial understatement of income tax for any taxable year if the amount of the understatement for the taxable year exceeds the greater of -- (i) 10 percent of the tax required to be shown on the return for the taxable year, or (ii) $ 5,000. (B) SPECIAL RULE FOR CORPORATIONS. -- In the case of a corporation other than a S corporation or a personal holding company (as defined in section 542), paragraph (1) shall be applied by substituting "$ 10,000" for "$ 5,000". (2) UNDERSTATEMENT. -- (A) IN GENERAL. -- For purposes of paragraph (1), the term "Understatement" means the excess of -- (i) the amount of tax required to be shown on the return for the taxable year, over (ii) the amount of the tax imposed which is shown on the return. (B) REDUCTION FOR UNDERSTATEMENT DUE TO POSITION OF TAXPAYER OR DISCLOSED ITEM. -- The amount of the understatement under subparagraph (A) shall be reduced by that portion of the understatement which is attributable to -- (i) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, of (ii) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return. (C) SPECIAL RULES IN CASES INVOLVING TAX SHELTERS. -- (i) IN GENERAL. -- In the case of any item attributable to a tax shelter -- (I) subparagraph (B)(ii) shall not apply, and (II) subparagraph (B)(i) shall not apply unless (in addition to meeting the requirements of such subparagraph) the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. (ii) TAX SHELTER. -- For purposes of clause (i), the term "tax shelter" means -- (I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if the principal purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax. ↩
11. See Harmon v. Commissioner,T.C. Memo. 1986-305↩.